LEROY GIPSON, JR.                    CIVIL ACTION NO. 06-cv-1809

VERSUS                               JUDGE WALTER

WARDEN LOUISIANA STATE               MAGISTRATE JUDGE HORNSBY
PENITENTIARY

## REPORT AND RECOMMENDATION

**Introduction**

A Caddo Parish jury convicted Leroy Gipson, Jr. ("Petitioner") of armed robbery. He was adjudicated a second-felony offender and received a 75-year sentence. The conviction was affirmed on direct appeal. State v. Gipson, 850 So.2d 973 (La. App. 2d Cir. 2003), writ denied, 865 So.2d 75 (La. 2004). Petitioner also filed an application for post-conviction relief. He now seeks federal habeas relief on a number of grounds. For the reasons that follow, it is recommended that the petition be denied.

**Factual Background**

Larry and Gloria Whorton, together with other family members, owned and operated Britt's Grocery on Linwood Avenue in Shreveport. Mr. Whorton testified that he had worked at the store since 1951, been an owner for the last 32 years, and had been in the store three times when it was robbed, the first robbery coming in 1954. Mr. and Mrs. Whorton were working in the store at about 8:30 p.m. one evening in January 1999 when robbers struck again.

The Whortons testified that two black males entered the store wearing bandanas over their faces, and at least one of the men also wore sunglasses and a baseball cap. Both men carried handguns. The shorter of the two robbers was the more aggressive, and he walked up to the counter where Mr. Wharton was standing and demanded his money. Mr. Wharton testified that he had two registers or money boxes, one for regular sales and one for money orders. He took $30 from the money order box and gave it to the robber. Mr. Wharton testified that he believed he handed the robber three $10 bills. Mrs. Whorton testified that she believed, based on discussions with her husband after the robbery, that the robber received one $20 bill and one $10 bill. Mr. Whorton was asked on cross-examination if he told a detective that he was not sure he gave the robbers $30. Mr. Whorton answered:

> I wasn't sure it was $30 I gave them. I was sure I gave them something, but I just -- I didn't count it.

Mr. Whorton testified that after he gave the money to the shorter robber, the robber said he wanted the rest of the money. Mr. Whorton told him to be calm, but the robber then jumped over the counter, put his gun in Mr. Whorton's ribs, and repeated his demand for the rest of the money.

Mr. Whorton told the shorter robber that he had more money in the back of his store. The robber first responded that Whorton should open the cash register, but Whorton never did. Whorton repeated that he had more money in the back, and the robber told him to go get it. Mr. Whorton testified that he turned and walked to the back of the store to a small office space, with the shorter robber following him with the gun in his ribs.

Unbeknownst to the robber, Mr. Whorton stored a 12 gauge pump shotgun, loaded with 00 buckshot, inside the door to the office. As Mr. Whorton walked in, he grabbed the shotgun. Mr. Whorton said that he expected the robber to shoot him as he went for the shotgun, but the robber turned and ran. Whorton fired when the man was at the counter area, about four feet away. Whorton immediately pumped another shell in the chamber and fired at the taller robber, who had been standing guard over Mrs. Whorton. The man was standing near the front door and facing Mr. Whorton when Whorton fired. Mr. Whorton pumped a third round in the chamber and walked up to the counter. The shorter robber was on the floor, on his hands and knees facing the door, and Mr. Whorton fired another shot at him from about six to eight feet away. The man was nonetheless able to get off the floor and run out the front door of the store, which the taller robber had already done.

Mr. Whorton looked outside, but it was dark and he did not see anyone in the area. He did see a baseball cap, a pair of sunglasses, and lots of blood outside the store. There was, however, no blood inside the store. The robbers did leave a handgun on the floor of the store. There was no major damage inside the store from the shotgun blasts. The taller man had been standing near a plate glass window when a shot was fired at him, but the glass was unbroken. The lack of serious damage inside the store and the amount of blood outside the store suggested that most of the buckshot had struck the targets. The Whortons called 911 and reported the robbery. See testimony of Gloria Whorton at Tr. 595-624 and James Larry Whorton at Tr. 631-62.

Detective Scott Porter was among the officers who responded to Britt's Grocery. He testified that officers found the revolver that the robbers left, and it was fully loaded with five .38 caliber rounds. They recovered two spent shotgun shells from the floor, and one from the chamber of the shotgun. They noted some buckshot damage to potato chip bags and other items in the store, and they recovered nine whole buckshot pellets or fragments of pellets. Officers found a heavy blood trail leading from outside the store to nearby Clanton Street and proceeding a few blocks on different streets before it ended abruptly, as if the person(s) bleeding got in a car.

At about 9:50 p.m., as the officers were completing their investigation at the store, they received a radio dispatch that two men were at a house on nearby Woodrow Street and were bleeding heavily. Police responded to the house. They encountered one man exiting the house, who had no wounds. Inside, they found Petitioner sitting on the couch in severe pain and bleeding from what appeared to be shotgun blast wounds to his leg, hip, shoulder, and abdomen. The second man, James Wilson, was found in the kitchen. Wilson's arm was almost severed, hanging only by flesh, and he was bleeding profusely. Officers saw two buckshot pellets on the top of a television in the living room. They found a box of .38 ammunition in a chest of drawers in the main bedroom. The police did not recover any money or firearms from the house or the persons inside. The two suspects were taken to the hospital, where they received surgery. <u>See</u> testimony of Detective Scott Porter at Tr. 722-40 and Officer F. P. McConnell at Tr. 663-77.

Detective Porter interviewed James Wilson a few days after the robbery, as soon as Wilson was discharged from the hospital and transferred to jail. Wilson gave a recorded statement in which he said that the robbery was his idea because he needed money to pay bills, and he proposed the plan to Petitioner on the day of the robbery. The men made their own masks and went to the store. Wilson depicted himself as the aggressive robber who jumped the counter and demanded money from Mr. Whorton. Wilson said that when Mr. Whorton turned with the shotgun, he (Wilson) turned and jumped the counter, tripped, and fell to the floor. Wilson believed that was when Whorton fired the first shot, which did not hit Wilson. Whorton then shot Petitioner, and he shot Wilson with the third round as Wilson was getting up from the floor. Wilson admitted wearing a blue glove with white stripes on his gun hand, and he said he discarded the glove as he ran from the store. (Porter testified that a detective found the glove along the blood trail.)

Wilson continued his statement, saying the men ran to his 1988 Cadillac and drove it to Petitioner's house on Woodrow Street. Wilson denied that he obtained any money during the robbery. He also claimed that he was the only one of the two who was armed with a weapon, and he claimed the gun was not loaded. Detective Porter responded that the recovered revolver was fully loaded, and Wilson then said the gun would not work. Tr. 741-58.

James Wilson, in addition to giving a statement to Detective Porter, testified at trial. He testified that he had reached a plea bargain with the prosecution and would testify at trial

in exchange for a 15-year cap on his exposure to sentencing for armed robbery. (Wilson later received an eight year sentence.) He said that Petitioner is his wife's brother, and he had known Petitioner for about seven years before the robbery. Wilson's testimony at trial had himself and Petitioner in reversed roles from what Wilson had told Detective Porter.

Wilson testified at trial that the robbery was Petitioner's idea, and Petitioner was the aggressive robber who jumped the counter. Wilson said that Petitioner was armed with the .38 revolver, and Wilson claimed that he was not armed. Wilson said that when Petitioner jumped the counter in an effort to escape Mr. Whorton's shotgun, Petitioner tossed the revolver. Wilson said he caught the gun, but he must have dropped it after he was shot. Wilson claimed that the men walked outside to his car, which was parked just a few feet from the store, and Petitioner then drove them to Petitioner's house. Wilson's 27-year-old son was at the house, and his wife Latosha soon arrived. Wilson said that he had been trying to protect Petitioner when he made his statement to Detective Porter. Tr. 684-720.

A treating orthopedic physician testified that Petitioner's shotgun wounds were to the outside of his right thigh and the back of his left shoulder. The shoulder wound was two or three inches in diameter and made by multiple pellets grouped tightly so they "all but made one single entrance wound." The wound to the thigh was less serious because the pellets went under the skin, damaged muscle, then exited the front of the thigh. Clothing and wadding from the shotgun shell were recovered from both wounds. Four or five identifiable

pellets could be seen in the X-ray of Petitioner's shoulder, but the pellets were not removed. Tr. 808-17.

Richard Beighley, a criminalist with the North Louisiana Crime Lab, examined the firearms and the buckshot pellets recovered from the crime scene and from Petitioner's house. Beighley said there was "not much you could do comparison wise" to link pellets to the shotgun from which they were fired, but all of the recovered pellets were consistent with 00 buckshot, which was the size shot stamped on the shells fired by Mr. Whorton.

Beighley also examined the .38 caliber revolver that was recovered at the scene. After examination of the gun, he contacted a prosecutor and explained that he did not think it was safe to test fire the gun at the laboratory because the cylinder of the revolver was not properly aligned with the barrel. The prosecutor agreed that, as there was no need for a bullet comparison to match a fired round, it was best not to attempt to fire the weapon.

Beighley explained that if a revolver's cylinder is not properly aligned, the firing pin may still strike the primer and cause the cartridge to fire, but part of the bullet may travel down the barrel while another part is shaved off and exits the side of the cylinder. He said there was never a determination that the gun would not fire.

The defense asked on cross-examination if it was possible to match a fired shotgun shell (or hull) to the shotgun in which it was fired. Beighley said that it was possible, based on markings on the shell caused by the firing pin and other parts of the gun that would mark the shell. He was then asked if it was possible to tell whether a particular buckshot pellet or

fragment came from a particular shell, and Beighley said that it was not, because a smooth bore shotgun (unlike a rifle or most handguns) does not make any markings on the pellets for linking the pellets to the weapon. Tr. 789-807.

Crime scene investigator Amy Chrietzberg testified that she followed the lengthy blood trail that began at the store. Along the route, she collected a black, child's T-shirt that was tied in a knot, which she found in the edge of a yard. She also collected a pair of sunglasses, a knit glove, and a knit hat. Tr. 764-72. Counsel later stipulated that a DNA analysis of a blood stain on the glove was consistent with the DNA profile of a sample taken from James Wilson. The odds that the stain came from another African-American was one in 29.6 trillion. Tr. 843-44.

The defense also presented evidence. Rosie Fisher, Petitioner's mother, testified that her granddaughter came to her house on the night of the robbery and told her that Petitioner had been shot. The women drove to the Woodrow Street house, where Ms. Fisher found her son on the couch with a gunshot wound. Ms. Fisher testified that it was not until after she arrived that James Wilson and an unidentified person walked in the house, and Wilson slid to the kitchen floor. Tr. 824-29.

Alan Ortego testified that he was serving time for armed robbery when he was in the same cell with James Wilson, about eight months before the trial. Ortego testified that the two men discussed the fact that they had the same attorney, Rickey Swift, and they began discussing their cases. Wilson said he had Swift working on a deal to get a seven-year

sentence for armed robbery. Ortego said that Wilson told him that he and his unnamed "partner" (not Petitioner) were shot in the robbery, and he got his partner to drive him to Petitioner's house because Wilson was scared to go to his own home. According to Ortego, Wilson said that he arrived at Petitioner's house only to learn that Petitioner (quite coincidentally and unrelated to the Britt's Grocery robbery) "had already got shot down the street from his house," so that when the ambulance arrived both men were there with shotgun wounds. Wilson, according to Ortego, said he had worked out a good deal with the prosecutor because the prosecutor "wanted" Petitioner because of his criminal record. Wilson, according to Ortego, said he was providing evidence against Petitioner because he was mad at Petitioner for "messing around with one of his girls, and he figured he'd get back at him this way." Ortego admitted on cross-examination that he had been Petitioner's cellmate for about the last six months. Tr. 837-43.

**Sufficiency of the Evidence**

To prove Petitioner guilty of armed robbery, the state had to prove that Petitioner took something of value from the control or possession of another person, by use of force or intimidation, while armed with a dangerous weapon. See La.R.S. 14:64. Petitioner contests the sufficiency of the evidence as his fourth issue in his habeas petition, but the issue should be the first one addressed. The sufficiency of the evidence issue should be reached even if the court were to decide that one of the other issues presented by Petitioner entitles him to a new trial. That is because if the evidence is insufficient to support the conviction, double

jeopardy principles would prohibit a new trial. See Greene v. Massey, 98 S.Ct. 2151 (1978); Patterson v. Haskins, 470 F.3d 645 (6th Cir. 2006); and U.S. v. Rodriguez, 260 F.3d 416 (5th Cir. 2001).

In evaluating the sufficiency of evidence to support a conviction "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 99 S.Ct. 2781, 2789 (1979). The trier of fact has broad discretion to "resolve conflicts in testimony, to weigh evidence, and to draw reasonable inferences from basic facts to ultimate facts." Id. The Jackson inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." Herrera v. Collins, 113 S.Ct. 853, 861 (1993).

The state appellate court addressed this issue on direct appeal. The court discussed at length the Jackson standard, and it then applied the standard to the facts. It noted that Petitioner is about five foot seven inches tall, while Wilson is about five foot eleven inches tall. Mr. Whorton said that he fired two blasts at the shorter robber, and one blast at the taller robber. That is consistent with Wilson having one serious wound and Petitioner having two shotgun wounds to different parts of his body. Both men were found soon afterward at a nearby house, suffering from the shotgun wounds. Petitioner's home contained a box of .38 caliber ammo that could be used in the handgun that was left at the scene of the crime by the

shorter robber. Buckshot pellets recovered in the house were consistent with Mr. Whorton's testimony that he fired 00 buckshot. The court also pointed to co-defendant Wilson's testimony that Petitioner was one of the perpetrators of the robbery. The court noted that Wilson had given contradictory statements about the roles that each men played in the robbery and various details of their escape, but the jury apparently accepted the evidence that Petitioner was a principal to the robbery. Meanwhile, the jury rejected the testimony of Petitioner's mother and the other defense witnesses who claimed that Petitioner coincidentally was shot by a shotgun in a separate incident at about the same time as the robbery. After considering these facts, the appellate court found that guilt was proven beyond a reasonable doubt. State v. Gipson, 850 So.2d at 976-78.

The Louisiana appellate court applied the Jackson standard on Petitioner's direct appeal, so its decision was not "contrary to clearly established Federal law," and Petitioner can obtain habeas relief only if the state court's decision was an "unreasonable application" of Jackson. 28 U.S.C. § 2254(d); Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000); Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001).

Under the unreasonable application clause, a federal court is permitted to grant the writ if the state court has identified the correct governing legal principle from the Supreme Court's decisions but unreasonably applied that principle to the facts of the prisoner's case. Williams, 120 S.Ct. at 1523. Even if the federal court, in its independent judgment, has a firm conviction that the state court was incorrect in its application of a federal constitutional

principle, that alone does not permit the federal court to grant habeas relief. Relief is not permitted unless the state court decision was so wrong as to be objectively unreasonable. Lockyer v. Andrade, 123 S.Ct. 1166, 1175 (2003).

Petitioner attacks the state court's decision by generally attacking the credibility of co-defendant Wilson, who later received a mere eight-year sentence. He notes the different versions of the events that Wilson gave. The state court noted that the jury was "fully aware of these facts and evidently accepted Wilson's trial testimony." Gipson, 850 So.2d at 978. Petitioner also urges that he presented evidence that his injuries were from a contemporaneous but different shotgun incident, but the jury obviously chose not to accept that evidence as credible.

If the jury accepted the prosecution's witnesses as credible, then it was rational to conclude that there was no reasonable doubt as to Petitioner's guilt. Such credibility determinations are squarely within the province of the trier of fact. "[U]nder Jackson, the assessment of the credibility of the witnesses is generally beyond the scope of review." Schlup v. Delo, 115 S.Ct. 851, 868 (1995). "A determination of a factual issue made by a State court shall be presumed correct" in a claim for federal habeas relief, and Petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." Ramirez v. Dretke, 398 F.3d 691, 695 (5th Cir. 2005), quoting 28 U.S.C. § 2254(e)(1). "All credibility choices and conflicting inferences are to be resolved in favor

of the verdict." Id. The jury was well within its role and acted quite reasonably when it credited the prosecution witnesses over those presented by Petitioner.

Petitioner also attacks the state court's statement that police recovered "from Gipson's house and shoulder, buckshot pellets consistent with Mr. Whorton's shotgun." Petitioner argues that the evidence at trial showed that no pellets were removed from his body. Petitioner appears to be correct on this point, but that simple mistake in the opinion does not detract from the ultimate decision that the evidence was sufficient under the Jackson standard to affirm Petitioner's conviction for armed robbery. And it is only the state court's ultimate decision, not the quality of its analysis or opinion, that is at issue on habeas review. Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002)(en banc). There was ample evidence that the jury could have chosen to believe that Petitioner, by use of force or intimidation, took from Mr. Whorton approximately $30 that belonged to Whorton, while Petitioner was armed with a dangerous weapon. The state court's decision of this issue was not objectively unreasoanble, so habeas relief is not permitted with respect to this claim.

**Challenge for Cause**

During jury selection, defense counsel asked what prospective jurors would do if the defense rested without putting on evidence. Counsel specifically asked a Mr. Davenport, who replied, "I would weigh the evidence." Counsel then asked if Davenport would "hold it against Mr. Gipson if we didn't put on any evidence?" Mr. Davenport replied: "I am not supposed to hold it against him; but I think that, if he were innocent, he wouldn't hesitate to

say so." Counsel reminded Mr. Davenport of prior discussions about the right to not testify.

Mr. Davenport said: "Right, and I recognize that right." Counsel then explored whether

Mr. Davenport's earlier statement was merely his personal belief, and she asked if he could

put aside that personal belief. He answered: "I would hope so" and, after being asked again,

"I'm not sure. I would have to weigh the evidence." When asked if he would weigh the fact

that the defendant did not testify or that there was no defense evidence, Davenport said: "I

would hope that I would not let that weigh, and I would consider evidence instead."

Tr. 394-95.

Defense counsel later made a challenge for cause against Mr. Davenport. She stated

"It wasn't real strong one way or the other, but I feel like he would have trouble putting aside

his belief that Mr. Gipson should take the stand." Judge Bryson, who conducted the trial,

said that he did not think that Mr. Davenport's answers rose to that level. The judge

interpreted the remarks to mean that Davenport "would like to hear what the Defendant had

to say, but he understands what the law is and understands how to apply it." The challenge

was denied. Tr. 398-99.

Petitioner raised this issue on direct appeal. The state appellate court reviewed the

relevant law and evidence at length and found that Davenport's responses did not rise to a

level of partiality that would prejudice the defense. State v. Gipson, 850 So.2d at 978-79.

The State argues that Petitioner failed to exhaust his state court remedies with respect

to this claim because his briefs on appeal referenced only state law regarding challenges to

jurors.  <u>See</u> appellate brief at Tr. 957-59.  It is, therefore, possible that Petitioner did not exhaust his state court remedies with respect to this claim.  <u>See</u> <u>e.g.</u>, <u>Baldwin v. Reese</u>, 124 S.Ct. 1347 (2004).  The claim, for the reasons set forth below, is also lacking in merit.

The standard for determining when a venire member may be excluded for cause is whether the prospective "juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." <u>Wainwright v. Witt</u>, 105 S.Ct. 844, 852 (1985) (internal quotation marks and footnote omitted). A state trial court's refusal of a petitioner's challenge for cause is a factual finding entitled to a presumption of correctness on habeas review. <u>Miniel v. Cockrell</u>, 339 F.3d 331, 338-39 (5th Cir. 2003), citing <u>Jones v. Butler</u>, 864 F.2d 348, 362 (5th Cir.1988).  The trial judge, who observed the exchange with Mr. Davenport firsthand, made a reasonable assessment of his qualifications to serve. Petitioner has not overcome the presumption of correctness that attaches to that decision, and the acceptance of Davenport as a juror was not an objectively unreasonable application of the principle stated in <u>Wainwright</u> and similar decisions.  Habeas relief is not permitted with respect to this claim.

**John Adams; Fingerprint Identification**

The prosecution called Deputy John Adams, Jr. to testify at a multiple offender hearing as to whether it was Petitioner's fingerprints on paperwork connected to a prior conviction.  Adams testified about his training in fingerprint classification and matching, received at both state and federal facilities.  He said he has compared thousands of prints and

that this would be his eighth time to testify as an expert in fingerprint identification. He conceded that he had not obtained certification by the International Association of Identification, but three co-workers were certified. The co-workers have reviewed his work in the past and have never decided that he was incorrect. Deputy Adams added that he had 10 years of experience in the field. The trial court accepted Adams as an expert, noting that his knowledge and experience were sufficient despite a lack of a national certification. Tr. 891-99.

Petitioner had counsel on appeal, but he also filed a pro se brief. He argued in his pro se brief that the trial court erred in allowing Adams to testify as a fingerprint expert witness. Tr. 987-89. The state appellate court reviewed this testimony and, noting the sound discretion of the trial judge in ruling on the qualification of experts, found no error. State v. Gipson, 850 So.2d at 982. The State argues that Petitioner pressed the issue without reference to it being of a federal nature, leaving it unexhausted under Baldwin v. Reese, supra. Petitioner, even in this court, has yet to frame this argument as a federal constitutional one. To obtain habeas relief, he must show that the state court's adjudication of this issue was an objectively unreasonable application of clearly established *federal* law. 28 U.S.C. § 2254(d). He has not satisfied that burden. Furthermore, the record supports the state appellate court's decision that the trial court was well within its discretion to accept Deputy Adams as a fingerprint expert.

**Multiple Offender Hearing**

The state presented evidence at a multiple offender hearing from the Department of Corrections, the Department of Probation and Parole, and the sheriff to establish that Petitioner had a prior armed robbery conviction in 1977, for which he obtained good-time release in 1994. Petitioner was sentenced as a second-felony offender. Tr. 919-37.

Petitioner argued in his pro se brief (Tr. 989-90) on direct appeal that some of the documents offered to prove the prior conviction were not admissible under the Louisiana Habitual Offender Statute or the Louisiana Code of Evidence.

The state appellate court reviewed the arguments regarding the arrest sheet and a print-out of records from the Department of Corrections that Petitioner challenged. It noted that the arrest sheet contained Petitioner's name and address, the crime for which he was arrested (armed robbery of another grocery store in Shreveport), his date of birth, his driver's license number, his fingerprint, and other information that could be used to link Petitioner to the later bill of information and conviction. The court found Petitioner's argument against the admissibility of this document to be "meritless." The court reached the same conclusion with regard to the other document. State v. Gipson, 850 So.2d at 981-82.

Petitioner attacked the multiple offender adjudication in his post-conviction application, using a slightly different argument. He argued that the state improperly relied upon NCIC reports that were not competent evidence to prove a prior conviction. Tr. 1100-02. The trial court ruled that the state appellate court had, on direct appeal, ruled

that there was sufficient evidence to sustain the multiple offender adjudication, so the claim was rejected as repetitive. Tr. 1183-84. Petitioner applied for a writ, and the state appellate court's decision was: "The trial court correctly denied relief on all claims in its ruling, and the writ is denied." Tr. 1357. The Supreme Court of Louisiana issued a one-word decision that Petitioner's writ application was "denied." Tr. 1566.

Petitioner's federal petition again attacks the use of NCIC reports. Petitioner is not specific as to which exhibit he contends was an NCIC report. In any event, the state did not attempt to prove a prior conviction based solely on an arrest record or similar document. Rather, the state assembled a number of documents surrounding the conviction to present adequate proof that Petitioner was in fact the man convicted for the prior armed robbery. The trial judge conducted a hearing in which documents were reviewed and discussed in detail, and he came to the conclusion that the state had met its burden.

This court does not sit to review evidentiary rulings in trials or multiple offender hearings unless they rise to the level of a federal constitutional violation. Furthermore, the state court's adjudication of the matter must be an objectively unreasonable application of federal law that is clearly established by the Supreme Court. Petitioner has not demonstrated that the admission of any one piece of evidence at the hearing was of such grave error and effect that there is any doubt about the final adjudication that Petitioner is a second offender. (There was also evidence at sentencing that Petitioner had other armed robbery convictions

and arrests, going back to the 1960's, but they were beyond the 10 year cleansing period.).

Petitioner has not demonstrated that he is entitled to habeas relief on this claim.

**Ineffective Assistance of Counsel**

    **A. Introduction**

Petitioner argued in his post-conviction application that his trial counsel was ineffective for a number of reasons. Petitioner bears the burden of proving two components, deficient performance and prejudice, to establish ineffective assistance of counsel. Counsel's performance was deficient only if he made errors so serious that, when reviewed under an objective standard of reasonable professional assistance and afforded a presumption of competency, he was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984). Prejudice exists only if there is a reasonable probability that, but for the error, the result of the trial would have been different. A reasonable probability is one sufficient to undermine confidence in the outcome. Id. 104 S.Ct. at 2068.

The test for habeas purposes is not whether a petitioner made the showing required under Strickland. The test is whether the State court's decision – that the petitioner did not make the Strickland showing – was contrary to, or an unreasonable application of, the standards provided by Strickland's clearly established federal law. Williams v. Taylor, 120 S.Ct. 1495 (2000); Henderson v. Quarterman, 460 F.3d 654, 665 (5th Cir. 2006).

**B. Ballistics Expert**

Petitioner argues that counsel was ineffective because she did not retain a ballistics or firearms expert.  He first urges that such an expert was needed to counter testimony by Richard Beighley regarding the 00 buckshot.  Judge Crichton, in denying the post-conviction application on this issue, noted that Mr. Beighley never testified that the buckshot recovered from Petitioner's home was fired from Mr. Whorton's shotgun.  Beighley said only that the pellets found in the home were the same size as 00 buckshot, which happens to be what Mr. Whorton fired.  Petitioner has not presented any indication that the buckshot recovered from his home was not consistent with 00 buckshot.  Tr. 1180-81.  Petitioner has yet to articulate how an expert might have countered that evidence.  His pure speculation does not result in the state court's adjudication of this issue being an objectively unreasonable application of <u>Strickland</u>.

Petitioner argues that an expert should have also been retained to testify as to whether the handgun recovered from the store would or would not fire.  Petitioner argues that he would have a defense to the crime of armed robbery if the gun were inoperable.  Judge Crichton noted that Louisiana law permits the finding that even an unloaded gun is a dangerous weapon when it is used in a manner likely to produce death or great bodily harm, and the likelihood of that harm can come from the threat perceived by victims.  Tr. 1181.  That danger was realized in this case when the handgun so threatened the victim that he shot

the robbers with his shotgun. Furthermore, Mr. Beighley testified that the handgun was not safe to fire. He never said that it would not fire.

Petitioner argues that the defense should have had an expert to (perhaps) opine that the gun was inoperable so that the jury could make a fact determination of whether a dangerous weapon was used in the robbery. Whether an object is a dangerous weapon is a factual issue that is to be decided within the context of how the gun was used in the robbery. The jury in State v. Lewis, 892 So.2d 702 (La. App. 2d 2005) made such a finding when robbers charged into a bank, armed with realistic-looking BB guns, screaming, threatening, and waving the guns. The conviction was affirmed, and the court offered a lengthy discussion of Louisiana law regarding unworkable or unloaded guns being deemed dangerous weapons when used in a manner likely to produce death or great bodily harm.

Petitioner has not pointed to a basis to find that counsel should have been aware before trial that the gun might be inoperable. Furthermore, there is almost no reason to believe that a jury, even had a firearms expert told them that the loaded .38 revolver would not fire (and we have no evidence of record to suggest that is the case), would have acquitted Petitioner of armed robbery under these circumstances. The manner in which the short, aggressive robber employed the weapon, jamming it in the victim's ribs and frightening him to the point of (the victim believed) risking his life by grabbing his shotgun and firing at the robbers, does not leave room for any reasonable probability that an expert's testimony that

the gun was inoperable would have resulted in an acquittal. Thus, the state court's adjudication of this issue was not an objectively unreasonable application of <u>Strickland</u>.

### C. Stipulations

Counsel stipulated at trial that the glove recovered by Officer Chrietzberg had a bloodstain that the crime lab found was consistent with the DNA profile of James Wilson. Counsel also stipulated that Detective Andrews, who was not available to attend trial due to a medical problem, would have testified that he interviewed James Wilson at the hospital shortly before surgery, and Andrews' testimony would have been substantially the same as Detective Porter's on that point. Tr. 843-44. Petitioner argues that counsel was ineffective because she "abandoned the adversarial role without any strategic gain" when she agreed to these stipulations.

Petitioner first raised this argument in his post-conviction application. Judge Crichton denied the claim. He noted that the DNA evidence merely linked Wilson to the crime, and Wilson freely admitted that he was one of the robbers. Detective Andrews' testimony would have been used to impeach Wilson's earlier statement, but Detective Porter testified live to serve that purpose, and Wilson admitted that he had given inconsistent statements. Under the circumstances, the stipulations did not prejudice the defense. Tr. 1182.

Defense counsel may make reasonable stipulations regarding uncontested evidence without conceding guilt or abandoning the adversarial role, and there is a presumption that the stipulations are sound trial strategy. <u>See</u> <u>Mattio v. Cain</u>, 267 Fed. Appx. 389, 391 (5th

Cir. 2008). There is nothing to suggest that the simple stipulations at issue were incompetent performance by defense counsel. Furthermore, there is no prejudice because there is no reasonable probability that, had the stipulations not been made, the verdict would have been different. The state court's adjudication of this issue was entirely reasonable.

### D. Audit of Cash Registers

An element of armed robbery is that "anything of value" is taken from another. Petitioner argued on post-conviction application that his counsel should have insisted on an audit of the store's cash register receipts so that perhaps the defense could have impeached Mr. Wharton's testimony that he gave the robbers $30. The trial court rejected the post-conviction application on this issue, finding no basis for requiring an audit. Tr. 1182-83.

Petitioner has not articulated how, under the framework for discovery in a Louisiana criminal case, counsel could have ordered such an audit. If the state had performed such an examination, perhaps the defense could obtain a copy of it, but mandating an audit of a victim is rather unusual discovery for which Petitioner has not cited a legal basis. Armed robberies are routinely proven in trial courts, with the victim's testimony that he handed over cash or goods to the robber usually being all the evidence heard on this point. Counsel was not ineffective for not attempting to obtain an audit of the victim, for which there is a questionable basis in law to demand, and it is wholly speculative that the small family-owned store could have later assembled records to allow a reliable audit for the day of the robbery.

The state court's rejection of this issue was not an objectively unreasonable application of Strickland.

### E.  Expert Funds

Petitioner argues that counsel should have filed a motion for funds that could be used to hire an expert.  Petitioner does not identify any expert, other than the firearms and ballistics experts discussed above, that could have been hired with those funds and would have assisted the defense.  He merely offers a generic argument that counsel should have made the request. This speculative argument suggests neither lack of competence by counsel nor any possible prejudice, so the state court was not objectively unreasonable when it denied relief on this claim.

### F.  Voir Dire

The court took a recess during the jury selection process, and Petitioner was apparently taken from the courtroom during the break.  When court resumed, Judge Bryson and counsel began discussing how many jurors had been selected, how the challenge process would work, and which potential jurors would next be considered.  After that very brief discussion, during which there were no challenges, strikes, or questions asked of jurors, the trial judge said: "Just a minute.  Let's let the Defendant come up."  The court reporter then placed on the transcript, "Whereupon the Defendant entered the room."  Tr. 574-76.

Petitioner argues that his counsel was ineffective because important decisions concerning the challenges for cause of jurors were discussed and made during his absence

from the court. The discussion in Petitioner's absence was in the nature of a bench conference regarding procedures, and no important decisions were made without Petitioner's presence. Counsel was not deficient for not insisting on the presence of her client during these ministerial discussions, and Petitioner can point to no basis for prejudice caused by his absence. The state court's rejection of this issue (Tr. 1183) was not objectively unreasonable.

### G. Black T-Shirt

A black T-shirt was introduced into evidence during Officer Chrietzberg's testimony. She said that she found the shirt along the blood trail. There was never any testimony or other evidence presented at trial to demonstrate any relevance of the shirt. Petitioner argues that his counsel was ineffective when she did not ask for a mistrial when the shirt was admitted into evidence despite its lack of listing on any property confiscation sheets.

Counsel did, however, move for a mistrial related to the shirt. She complained that she learned on the first day of trial that the state intended to introduce evidence that the shirt had been found near the crime scene and contained blood DNA consistent with Petitioner. She argued that this evidence had been disclosed untimely and prejudiced the preparation of a defense. Tr. 175-76. The T-shirt was later admitted into evidence, but (presumably based on a ruling by the trial judge), the state did not present any evidence about DNA on the shirt or that otherwise tied the shirt to Petitioner.

Judge Crichton denied the post-conviction application with respect to this issue because the admission of the shirt, without any evidence linking it to Petitioner, did not

prejudice the defense in any way. Tr. 1183. That decision was entirely reasonable. There was no basis to find that Petitioner met his burden under <u>Strickland</u> with respect to either of its two-prongs. Furthermore, counsel performed admirably by acting quickly to gain suppression of the DNA evidence, which would have been a huge blow to Petitioner's claim that he was shot far away from the store.

**Conclusion**

The court has reviewed each of Petitioner's several issues, examined all relevant portions of the state court trial record, and considered the relevant state court decisions. Petitioner has not demonstrated that those decisions ran afoul of the demanding standard for habeas relief found in 28 U.S.C. § 2254(d). The state court decisions were supported by evidence of record and were reasonable applications of the relevant legal standards.

Accordingly;

IT IS RECOMMENDED that Petitioner's petition for writ of habeas corpus be **denied**, and that his complaint be **dismissed with prejudice**.

**Objections**

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are

directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 10 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 22nd day of June, 2009.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE